

FILED
2019 Oct-04  PM 03:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHWEST DIVISION

| | |
|---|---|
| CHERYL JARMON-GOODMAN,  ) | |
| ) | |
| Plaintiff,  ) | |
| ) | |
| v.  ) | **CASE NO. 3:18-cv-00591-CLS** |
| ) | |
| SAM GARRISON,  ) | |
| STEVE BENSON  ) | |
| ) | |
| Defendants.  ) | |

---

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
## OF SERGEANT SAM GARRISON

---

**David J. Canupp**
**J. Bradley Emmons**
**LANIER FORD SHAVER & PAYNE, P.C.**
**P. O. Box 2087**
**Huntsville, AL 35804**

***Attorneys for Defendant Sam Garrison***

TABLE OF CONTENTS

I.    Statement of Undisputed Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      A.    General Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      B.    Sergeant Garrison's Involvement on April 18, 2016. . . . . . . . . . . . . 1

      C.    Sergeant Garrison's Noninvolvement in Plaintiff's Arrest. . . . . . . . . 5

      D.    Force Used During Plaintiff's Arrest. . . . . . . . . . . . . . . . . . . . . . . . . 9

      E.    Plaintiff's Shifting, Recanted Testimony. . . . . . . . . . . . . . . . . . . . . 11

      F.    Plaintiff's Bankruptcy Proceeding. . . . . . . . . . . . . . . . . . . . . . . . . . 16

II.   Legal Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

III.  Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

      A.    Because No Rational Trier of Fact Could Find for Plaintiff,
            Sergeant Garrison is Entitled to Judgment as a Matter of Law. . . . . 21

            i.    Plaintiff's Recantation of Earlier Testimony Leaves
                  Nothing in the Record Affirmatively Showing That
                  Sergeant Garrison Was Involved in Her Arrest. . . . . . . . . . . 21

            ii.   No Reasonable Jury, Taking the Record as a Whole, Could
                  Find for Plaintiff. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

      B.    Plaintiff's Misrepresentations to the Bankruptcy Court Require
            That Her Claims Be Dismissed. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

IV.   Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

      CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

i

## I.   <u>Statement of Undisputed Facts</u>

### A.   **General Background**

1.     The incident underlying this lawsuit occurred on the night of Monday, April 18, 2016. (See, e.g., Doc. 50 ¶ 3).

2.     As of that date, each officer with the Sheffield Police Department ("SPD") was assigned to one of four twelve-hour shifts. (See, e.g., Garrison Aff. ¶ 3). Monday day shifts were covered by "Shift A," which lasted from 6:00 a.m. to 6:00 p.m. (See <u>id</u>.; Exh. A to Garrison Aff.). Monday night shifts were covered by "Shift C," which lasted from 6:00 p.m. until 6:00 a.m. the following morning. (See <u>id</u>.).

3.     The shift report lists the lieutenant, sergeant, and other officers assigned to work that day's shift. (See, e.g., 4/18/2016 Shift A Report). The shift report also lists, among other things, the SPD vehicle to which each officer is assigned for that shift. (See, e.g., 4/18/2016 Shift A Report).

4.     In April 2016, Sgt. Sam Garrison was employed with SPD as a sergeant. (See, e.g., Garrison Aff. ¶ 1). His badge number was 391, and his radio call sign was Sierra-4." (See Garrison Aff. ¶ 6); (see also Bissonnette Depo. 26:18-24, 27:9-12).[1]

### B.   **Sergeant Garrison's Involvement on April 18, 2016**

5.     On Monday, April 18, 2016, Sgt. Garrison was assigned to work an

---

[1]Though SPD patrol officers use their badge numbers over the radio, higher-ranked officers receive a call sign based on rank. (E.g., Bissonnette Depo. 26:18-27:18). Sergeants receive a "Sierra" call sign, and lieutenants receive a "Lincoln" call sign. (See <u>id</u>.).

overtime shift during the day shift, *i.e.*, Shift A. (Garrison Aff. ¶ 5); (4/18/2016 Shift A Report). This meant that his shift was to end around 6:00 p.m. (Garrison Aff. ¶ 5); (4/18/2016 Shift A Report). Sgt. Garrison was assigned vehicle SPD-14. (Id.).

6.      At approximately 5:30 p.m. that evening, an officer with the Florence Police Department ("FPD") informed Colbert County 911 that Sheffield resident Elizabeth Evans[2] had reported an altercation in Florence. (Call 1[3]); (Garrison Aff., Ex. B: Call Logs at 1-2). The FPD officer reported that Evans had been involved in a dispute with a work colleague, whom he identified as Plaintiff. (Id.). The FPD officer further reported that Plaintiff had allegedly threatened to "whoop [Evans's] ass" and that Evans was worried Plaintiff might come by her house in Sheffield. (Id.).

7.      In response, Colbert County 911 dispatched extra SPD patrols to the area around Evans's home. (Call 1 Radio Traffic); (Call Logs at 1-2).

8.      At 5:47 p.m., Evans herself contacted Colbert County 911 and asked to speak to an SPD officer about new threatening communications she had received from Plaintiff. (Call 2 pts. 1-2); (Call Logs at 3-5). Colbert County 911 dispatched SPD officers to her home in response. (Call 2 Radio Traffic pt. 1); (Call Logs at 3).

---

[2]Elizabeth Evans is sometimes referred to in the evidence by her maiden name, Elizabeth Baker. (See, e.g., Plaintiff Depo. 108:14-109:1).

[3] There were five calls and corresponding radio traffic related to the events which are the subject of this action. The calls and traffic are conventionally filed with the court because they are sound files. They are Exhibit F to the Garrison Affidavit).

9.    At 5:54 p.m., Sgt. Garrison (using the call sign "Sierra-4") responded that he and another officer were en route. (Call 2 Radio Traffic pts. 2-3); (Call Logs at Garrison Aff., ¶ 8 and Exhibit B). The officers arrived at Evans's house at about 5:58 p.m. (Call 2 Radio Traffic pt. 5); (Call Logs at 3 and Garrison Aff., ¶ 9) (showing units "SPD-02" and "SPD-14" as dispatched).

10.    Evans told Sgt. Garrison that Plaintiff had quit her job earlier that day, that Plaintiff had verbally threatened Evans after quitting, and that Plaintiff had sent Evans several threatening text messages since that time. (Garrison Aff. ¶ 10, Exhibit 1 to Garrison Depo: Incident Report #209 at 3). Evans stated that Plaintiff had also called and threatened to assault Evans at her home. (Garrison Aff. ¶ 10); (Incident Report #209 at 3).

11.    While on scene, Sgt. Garrison ran a warrant check on Plaintiff. (Call 2 Radio Traffic pt. 6). Dispatch responded that Plaintiff had outstanding warrants out of Limestone County for "insufficient funds." (Call 2 Radio Traffic pt. 7).

12.    Sgt. Garrison told Evans that he would file a report and advised her to contact SPD again if Plaintiff came by her house. (Garrison Aff. ¶ 11). He left Evans's home around 6:05 p.m. (Call 2 Radio Traffic pt. 8); (Call Logs at 3).

13.    At approximately 6:14 p.m., Sgt. Garrison entered a report (hereinafter "Incident Report #209") documenting the incident. (Garrison Aff. ¶ 14); (Incident Report #209 at 1-3). Sgt. Garrison entered all information on the first three pages of

Incident Report #209, including the narrative text on pages 2 and 3. (Garrison Aff. ¶ 15); (Incident Report #209 at 1-3). The front page of Incident Report #209 indicates that Sgt. Garrison, badge number 391, was the reporting officer who entered the report at 6:14 p.m. (Incident Report #209 at 1).

14.     Sgt. Garrison did *not* write or enter the later "supplemental narrative" text appearing on page 4 of Incident Report #209. (Garrison Aff. ¶ 16); (Garrison Depo. 21:15-22:3, 25:16-18, 26:17-19); (see also Bissonnette Depo. 45:4-7) (acknowledging that Officer Bissonnette wrote that narrative).

15.     Sgt. Garrison officially ended his shift shortly after entering Incident Report #209 at 6:14 p.m. (Garrison Aff. ¶ 17).

16.     To the best of his recollection, after ending his shift, Sgt. Garrison drove either to his fiancee's home in Rogersville, AL (approximately 45 minutes away) or to his parents' house in Elkton, TN (about 80 minutes away). (Garrison Aff. ¶ 17); (Garrison Depo. 13:2-7).

17.     Sgt. Garrison did not return to Sheffield at any point that night after his shift ended, and he did not work any shifts the next day. (Garrison Aff. ¶ 17).

18.     Sgt. Garrison did not visit Plaintiff's house at any time on April 18, 2016. (See Garrison Aff. ¶¶ 19-21); (Garrison Depo. 14:25-15:3).

19.     The foregoing paragraphs fully describe *all aspects* of Sgt. Garrison's involvement in the events underlying this lawsuit. (See Garrison Aff. ¶¶ 5-21).

4

C.     **Sergeant Garrison's Noninvolvement in Plaintiff's Arrest**

20.     Sgt. Garrison understands from this lawsuit that Plaintiff was arrested on the night of April 18, 2016, some hours after he filed Incident Report #209 and ended his shift. (Garrison Aff. ¶ 18).

21.     Plaintiff specifically alleges that three police officers—"a combination of Sheffield and [City of] Muscle Shoals police officers"—were involved in her arrest. (See, e.g., Plaintiff Depo. 43:6-8, 43:25-44:2).

22.     The three officers involved in Plaintiff's arrest were Muscle Shoals Police Department Officer Steve Benson, SPD Officer Nathan Bissonnette, and SPD Officer Sam Bishop. (See, e.g., Benson Depo. 11:4-24, 17:20-22, 31:15-23); (Bissonnette Depo. 35:10-19, 54:16-21); (Bishop Aff. ¶¶ 3, 16). SPD Lt. Daryl Ivy was also present, but he did not participate in the arrest. (See, e.g., Benson Depo. 17:20-22, 31:15-23); (Bissonnette Depo. 35:20-25, 54:16-21); (Bishop Aff. ¶ 16).

23.     At about 2:35 a.m., several hours after Plaintiff's arrest, Officer Bissonnette wrote a report (hereinafter "Incident Report #211") documenting the incident. (Incident Report #211); (see also Bissonnette Depo. 41:12-42:1, Exhibit 3).[4]

---

[4] At some point, Officer Bissonnette's narrative text from Incident Report #211 was also entered into Incident Report #209 as a "supplemental narrative." *Compare* (Incident Report #211 at 3), *with* (Incident Report #209 at 4). This text was added to both reports at approximately the same time, while Sgt. Garrison was off-duty. (Incident Report #209 at 4); (Incident Report #211 at 3). Officer Bissonnette testified that narrative text would sometimes be copied from one incident report to another as a "supplemental narrative" to show a "link" involving two events, "so that it follows a chain." (Bissonnette Depo. 45:8-19).

24.     Incident Report #211 makes clear that Officer Bissonnette, Officer Bishop, and Officer Benson were the three officers involved in Plaintiff's arrest. (See Incident Report #211 at 3); (see also id. at 1) (identifying "Nathan Bissonnette" as the reporting officer).

25.     Those three officers have testified that they were the *only* officers involved in Plaintiff's arrest. (See, e.g., Benson Depo. 11:10-24, 17:20-22, 31:15-23); (Bissonnette Depo. 54:16-21); (Bishop Aff. ¶ 16).

26.     The officers have also confirmed that Sgt. Garrison was not on duty at the time of Plaintiff's arrest. (Bissonnette Depo. 34:5-20); (Bishop Aff. ¶¶ 9-10).

27.     Moreover, each of these officers has affirmatively and unambiguously testified that *Sgt. Garrison was not present for, and did not participate in any way in, the arrest of Plaintiff on April 18, 2016.* (See, e.g., Benson Depo. 30:21-32:4); (Bissonnette Depo. 56:15-57:5, 93:1-94:4); (Bishop Aff. ¶¶ 3, 14-17).

28.     The officers' clear testimony on these points is also supported by unassailable documentary and audio evidence, including the shift report for the night of April 18, 2016, 911 call logs, and recordings of all relevant radio traffic.

_____

It is undisputed that Officer Bissonnette wrote the narrative text in Incident Report #211 and the identical "supplemental narrative" in Incident Report #209. (See, e.g., Bissonnette Depo. 42:10-23). Sgt. Garrison did not write or submit that narrative text in either report, and he did not authorize anyone to add that text to Incident Report #209. (Garrison Depo. 9:17-10:4, 19:18-20:1). Plaintiff effectively concedes as much, since the author of that text admits to tasing Plaintiff (Incident Report #211 at 3) and Plaintiff acknowledges that Sgt. Garrison did not tase her (Plaintiff Depo. 305:6-12).

29.     The shift report for the night shift on April 18, 2016—Shift C—shows that Sgt. Garrison was not on duty that night, and that the SPD vehicle he had used earlier was assigned to another officer for the night shift. (Garrison Aff., Exh. E: 4/18/2016 Shift C Report).

30.     At about 7:41 p.m. that night—long after the end of Sgt. Garrison's shift—Evans called Colbert County 911 again to report further harassment by Plaintiff. (Call 3); (Call Logs at 6-7). Officer Bissonnette, *and only Officer Bissonnette*, visited Evans's home in response to the subsequent dispatch call. (See Call 3 Radio Traffic pt. 1) (dispatching "408, Car 2"); (Call 3 Radio Traffic pt. 2-4) (reports by "408"); (Call Logs at 6) (noting "SPD-02" as the dispatched unit); (see also Bissonnette Depo. 26:5-8) (noting that "408" was Officer Bissonnette's call sign); (Garrison Aff. ¶ 6) (same); (Bishop Aff. ¶ 29) (same); (4/18/2016 Shift C Report) (noting Officer Bissonnette was assigned to SPD vehicle 2); (see generally Bissonnette Depo. 48:22-24) (noting that Officer Bissonnette visited Evans twice).

31.     At about 9:21 p.m., Evans called Colbert County 911 yet again to report further threatening communications by Plaintiff. (Call 4 pts. 1-6); (Call Logs at 8-11). Officer Bissonnette and Officer Bishop responded to the subsequent dispatch call. (Call 4 Radio Traffic pt. 1-2) (responses from both "395" and "408"); (Call Logs at 8) (noting that "SPD-02" and "SPD-17" were dispatched); (see also, e.g., Bissonnette Depo. 27:19-21) (noting that "395" was Officer Bishop's call sign); (Bishop Aff.

7

¶ 29) (same); (4/18/2016 Shift C Report) (noting Officer Bishop was assigned to SPD vehicle 17 that night); (see generally Bissonnette Depo. 48:22-24) (noting that Officer Bissonnette visited Evans twice). Lt. Ivy also responded to the dispatch call. (Call 4 Radio Traffic pt. 3) (response from "Lincoln-2"); (Call Logs at 8) (noting "SPD-12" was dispatched); (see also Bissonnette Depo. 27:13-18) (noting "Lincoln-2" was Lt. Ivy's call sign); (Bishop Aff. ¶ 29) (same); (4/18/2016 Shift C Report) (noting Lt. Ivy was assigned to SPD vehicle 12).

32.     At 9:56 p.m., SPD officers were dispatched to Plaintiff's home to arrest her on her outstanding warrants. (Call Logs at 12-14); (Bissonnette Depo. 53:2-22).

33.     Lt. Ivy specifically reported that he, Officer Bishop, and Officer Bissonnette were en route to Plaintiff's residence in Muscle Shoals. (See Call 5 Radio Traffic pt. 1). *Lt. Ivy did not report that any other SPD officers were en route to Plaintiff's house or otherwise involved in the effort to arrest her.* (See id.).

34.     The call logs show that the *only* SPD officers dispatched to Plaintiff's home were officers in vehicles SPD-02, SPD-12, and SPD-17—respectively, Officer Bissonnette, Lt. Ivy, and Officer Bishop. (See Call Logs at 12-14).

35.     At 10:05 p.m., Officer Bissonnette and Lt. Ivy reported "taser deployed" to Colbert County 911. (Call 5 Radio Traffic pt. 2); (Call Logs at 13). *Sgt. Garrison is not heard or mentioned by the officers in that radio traffic*. (See id.).

36.     At 10:07 p.m., Officer Bishop reported that he was transporting Plaintiff

to jail "for 408," *i.e.*, for Officer Bissonnette. (Call 5 Radio Traffic pts. 3-5); (Call Logs at 12-13) (noting "transp jail"). Officer Bishop arrived at the jail with Plaintiff at 10:13 p.m. (Id.). *Sgt. Garrison is not heard or mentioned by the officers on any of that radio traffic.* (See id.).

37.    The remaining radio traffic from that incident pertains to Officer Bishop's post-arrest transport of Plaintiff to the hospital to have a Taser prong removed, and then to a meet-up with Limestone County law enforcement to transfer her to their custody. (See Call 5 Radio Traffic pts. 6-10); (Call Logs at 13-14).

38.    In summary, the radio traffic pertaining to Plaintiff's arrest *only* features responses from Officer Bissonnette, Officer Bishiop, and Lt. Ivy; states only that *those* SPD officers were responding; does *not* mention any other SPD officers; and does *not* feature any audio of Sgt. Garrison. (Call 5 Radio Traffic pts. 1-10).

39.    In other words, the audio of the radio traffic from the night of April 18, 2016, irrefutably shows what the documentary evidence confirms, and what the officers have testified: *Sgt. Garrison was not present for Plaintiff's arrest and did not participate in Plaintiff's arrest.* (Id.); (see also Call Logs at 12-14); (4/18/2016 Shift C Report); (Incident Report #211); ( Benson Depo. 30:21-32:4); (Bissonnette Depo. 56:15-57:5, 93:1-94:4); (Bishop Aff. ¶¶ 3, 14-17).

D.    **Force Used During Plaintiff's Arrest**

40.    Because Sgt. Garrison was not present for and did not participate in

Plaintiff's arrest, he necessarily did not use any force in the course of that arrest. (See, e.g., Garrison Aff. ¶¶ 19-20); (Garrison Depo. 15:4-14); (Benson Depo. 31:24-32:4); (Bissonnette Depo. 56:15-57:5); (Bishop Aff. ¶¶ 21-22, 25).

41.     Plaintiff is "100 percent certain" that Sgt. Garrison was not the officer who tased her. (Plaintiff Depo. 305:6-12).

42.     Plaintiff also acknowledges that Sgt. Garrison did not handcuff her. (See id. 81:8-9) (stating Officer Benson handcuffed her); (see also Bissonnette Depo. 55:22-23) (stating that Officers Bishop and Benson handcuffed her).

43.     Plaintiff has at times alleged that she was "dragged" out of her house after she was handcuffed. (See, e.g., Doc. 50 ¶ 22).

44.     But the responding officers, and Plaintiff's husband and son, testified that Plaintiff simply dragged her feet as officers carried her outside in an upright fashion. (Bissonnette Depo. 62:16-63:4); (Frank Goodman Depo. 79:20-80:5, 113:9-16) (officers carried Plaintiff out upright); (Jordan Goodman Depo. 54:20-55:9) (Plaintiff *walked* out, and any carrying was "[j]ust like a small, little carry").

45.     However Plaintiff was "carried," it was Officer Bissonnette and Officer Bishop doing the carrying. (See, e.g., Garrison Aff. ¶¶ 19-20); (Bissonnette Depo. 56:15-57:5, 62:16-63:4); (Bishop Aff. ¶ 25); (Benson Depo. 31:24-32:4).

46.     Finally, Plaintiff has sometimes alleged that Sgt. Garrison kicked her in the course of her arrest. (Doc. 50 ¶ 23).

47.     Every non-party witness has testified that *Plaintiff was not kicked by anyone.* (Bissonnette Depo. 57:6-8); (Bishop Aff. ¶ 24); (Jordan Goodman Depo. 79:8-17); (Frank Goodman Depo. 113:21-114:10).

48.     In any event, Sgt. Garrison did not kick Plaintiff that night, as he was not present. (See, e.g., Garrison Aff. ¶¶ 19-20); (Garrison Depo. 15:8-10); (Bissonnette Depo. 57:3-4); (Bishop Aff. ¶ 25); (see also Benson Depo. 31:24-32:4).

49.     In short, Sgt. Garrison did not tase Plaintiff, he did not handcuff Plaintiff, he did not carry or "drag" Plaintiff, he did not kick Plaintiff, and he did not use any other force on Plaintiff. (See, e.g., Garrison Aff. ¶¶ 19-20); (Garrison Depo. 15:8-10); (Bissonnette Depo. 57:3-4); (Bishop Aff. ¶ 25); (Benson Depo. 31:24-32:4).

**E.     Plaintiff's Shifting, Recanted Testimony**

50.     Although Plaintiff has at times identified Sgt. Garrison as being involved in her arrest, that identification is premised entirely on inconsistent testimony that is utterly discredited by the evidentiary record and recanted by Plaintiff herself.

51.     Plaintiff first testified that she had not previously encountered *any* SPD officers prior her arrest. (Plaintiff Depo. 42:2-23). She also testified that she recognized that officers were from SPD *only* because they said as much at the time of her arrest, and because her son had supposedly looked out the window before her

arrest and asked why SPD officers were present.[5] (See id. 42:21-43:12).

52.     But after questions were raised concerning the identity of the officers involved in her arrest, Plaintiff claimed that she also knew that Sgt. Garrison was present because she saw his name on his nametag. (See, e.g., Plaintiff Depo. 97:1-14, 99:15-21). Plaintiff specifically claimed that she could read Sgt. Garrison's name on his nametag *while she was still in bed*, as he stood *over ten feet away* at the foot of her bed. (See id. 97:3-24, 185:25-186:24, 194:6-12).

53.     Plaintiff later admitted that she has to wear glasses for reading, and that she was not wearing those glasses at the time. (Plaintiff Depo. 314:22-315:3). When asked how she could read the officers' nametags from ten feet away without her glasses, Plaintiff changed her testimony, claiming that she read the nametags *after* she was tased. (Id. 394:22-395:21) (stating that Plaintiff saw nametags after getting out of bed); (see also id. 63:16-19) (stating that Plaintiff got up only after she was tased).

54.     Plaintiff next claimed that she could identify Sgt. Garrison when she was arrested because she had been introduced to him by her uncle, Reshell Ingram, who she claimed was an SPD officer who had worked with him. (See, e.g., Plaintiff Depo. 96:3-23, 299:25-300:7, 333:11-334:11, 335:1-336:2). Plaintiff testified that Ingram

---

[5]Plaintiff's husband disputes that this occurred, testifying that their son did not look out the window or mention anything about SPD officers before they entered the house. (Frank Goodman Depo. 118:2-10). For his part, Plaintiff's son testified that he only came to understand that the officers were from SPD when he walked outside , as his mother was being removed from the house. (Jordan Goodman Depo. 27:14-18, 47:15-22).

introduced her to Sgt. Garrison in *2011*. (See id. 333:11-334:11, 336:1-2).[6]

55.     It turns out, however, that *Reshell Ingram died in 2001*. (Ingram Death Certificate); (see also Frank Goodman Depo. 102:6-103:5).

56.     To his knowledge, Sgt. Garrison has never met Ingram. (Garrison Aff. ¶ 41). At the time of Ingram's death, Sgt. Garrison was 11 years old and (needless to say) not yet employed by SPD. (See Garrison Depo. 4:14-18).

57.     *No one* could have introduced Sgt. Garrison as an SPD officer in 2011, since he did not join SPD until August 2014. (E.g., Garrison Depo. 4:14-16).

58.     Finally, Plaintiff testified that she had previously seen Sgt. Garrison at a cousin's house in Sheffield, as he was pursuing a suspect. (Plaintiff Depo. 329:1-332:8). Plaintiff alternately claimed that this encounter occurred on *July 4, 2011* (id. 299:8-17), or on *July 4, 2014* (id. 334:19-25).

59.     But Plaintiff could not possibly have observed Sgt. Garrison working as a Sheffield police officer in July 2011 or July 2014, because Sgt. Garrison did not join SPD until *August 2014*. (E.g., Garrison Depo. 4:14-16).[7]

_____

[6]Plaintiff's testimony as to whether Ingram introduced her to Sgt. Garrison *by name* also changed over the course of her deposition. *Compare* (Plaintiff Depo. 300:8-12) ("I seen him, but I never did know his name because I never asked things of what went on, so..."), *with* (id. 335:18-25) (claiming Ingram introduced Sgt. Garrison by name).

[7]Plaintiff also claimed that she encountered Sgt. Garrison at a food establishment later in 2014 or 2015. (Plaintiff Depo. 327:24-328:17). But she acknowledged that she only knew this person to be Sgt. Garrison because of her earlier encounter with him in July 2014. (Id. 328:23-329:12). Since this encounter could not possibly have happened, her testimony on this point is equally incredible.

60.     Plaintiff's false identification of the officers purportedly involved in her arrest is further illustrated by her complete refusal to admit that Officer Bissonnette even participated in her arrest. (See, e.g., Plaintiff Depo. 109:22-25).

61.     In fact, Officer Bissonnette's involvement in Plaintiff's arrest is conclusively established by the call logs concerning that event, which show that his vehicle was dispatched to the scene (Call Logs at 12-14); radio communications by Officer Bissonnette and others placing him at the scene (Call 5 Radio Traffic pts. 1-2, 4); the testimony of the other officers involved in her arrest (see, e.g., Benson Depo. 20:4-22:7); (Bishop Aff. ¶ 13, 16, 19-20); the testimony of Officer Bissonnette himself (see e.g., 54:9-55:25); and the incident report written and submitted by Officer Bissonnette later that night (see Incident Report #211).

62.     Officer Bissonnette was not only present for and involved in Plaintiff's arrest, but *he was also the officer who tased her.* His incident report states this. (See Incident Report #211 at 3). The other officers testified to this. (Benson Depo. 22:2-7); (Bishop Aff. ¶ 19-20). Officer Bissonnette himself testified to this. (Bissonnette Depo. 55:13-25). Although he did not actually witness Plaintiff's tasing, Plaintiff's husband recalled that Officer Bissonnette, "[t]he tallest one of the three officers," announced that he was going to tase Plaintiff. (See Frank Goodman Depo. 77:20-78:9); (see also, e.g., Bissonnette Depo. 79:18-19) (Officer Bissonnette is 6'5"); (Benson Depo. 7:10-11) (Officer Benson is 5'5"). And the log associated with Officer

14

Bissonnette's Taser, which shows a discharge from that night, establishes that he was the officer who tased her. (See Exhibit 5 to Bissonnette Depo: Taser Report)[8]; (see also Incident Report #211 at 3) (indicating serial number for Taser used that night); (Bissonnette Depo. 57:9-58:18) (confirming the Taser report's accuracy and noting that the serial number on that report matches the serial number listed in Incident Report #211); (Plaintiff Depo. 262:15-20) (acknowledging that the officer used his own Taser).

63.    In any event, **Plaintiff has now admitted, in a sworn affidavit, that she lied under oath about the identities of the officers involved in her arrest**:

> I was told that the police officers that was named in my case was dismissed although (I did know) who they were but . . . I could not go back and add those police officers to my case so *I had to choose those that was remaining in order to get to the next step* which was the (deposition). So going forward [my attorney] basically had me to *lie under oath* . . . .

(Doc. 71, p. 2) (emphasis supplied).

64.    In other words, Plaintiff understood that "police officers" who were actually present for her arrest were not parties to this case and could not be added as defendants, so she felt compelled to "lie under oath" in order to keep her claims alive. (See id.).

---

[8]The Taser log lists the time of discharge as about 10:30 p.m. (Taser Report). This corresponds roughly to the actual time that the Taser was used. (See, e.g., Call Log at 13). Officer Bissonnette noted that Taser logs are not necessarily 100% accurate as to time, but are roughly accurate on that point. (See Bissonnette Depo. 95:20-97:3).

65.     It is undisputed that three officers were involved in Plaintiff's arrest. (E.g., Plaintiff Depo. 43:25-44:2). There has never been any dispute that Officer Benson and Officer Bishop were present for her arrest. (E.g., id. 44:13-17). And Officer Bishop was indeed dismissed from this case. (See Doc. 47).

66.     Therefore, it is clear that the "police officers" (plural) that Plaintiff thought could not be added to this case, but that she "did know" were involved in her arrest, were the two SPD officers who *actually* were involved in her arrest: Officer Bissonnette and Officer Bishop. (See Doc. 71 at 2). And this necessarily means that Plaintiff understood that she had "lie[d] under oath" when she testified that Sgt. Garrison had any involvement in her arrest. (See id.).

**F.     Plaintiff's Bankruptcy Proceeding**

67.     Plaintiff filed at least two Chapter 13 proceedings in the Northern District of Alabama Bankruptcy Court prior to 2017. (See 1998 Ch. 13 Bankruptcy Docket); (2004 Ch. 13 Bankruptcy Docket). In at least one of those proceedings, Plaintiff identified a pending lawsuit as an asset. (See 2004 Bankruptcy Plan at 7).

68.     In August 2017, Plaintiff filed a petition for Chapter 13 bankruptcy in In re Goodman, No. 17-bk-82559 (Bankr. N.D. Ala.). (2017 Bankruptcy Plan). At the time, Plaintiff identified this lawsuit as a financial asset. (Id. at 14). Plaintiff's Chapter 13 plan was confirmed in November 2017. (See Confirmation Order).

69.     On August 6, 2019, the Trustee in Plaintiff's bankruptcy case requested

a hearing to determine the status of *this* lawsuit, specifically seeking information "as to whether or not the case has settled." (Tr.'s Motion for Status Conference).

70.     In response, the Court scheduled a status conference "to determine [the] status of Debtor's pending cause of action which constitutes property of the estate." (See Order Scheduling Status Conference).

71.     At a hearing on September 5, 2019, Plaintiff's attorney represented to the bankruptcy court "that **Debtor no longer seeks to pursue the civil litigation.**" (See Order Vacating Status Conference) (emphasis supplied). The Court then directed Plaintiff herself to file an affidavit concerning the status of this lawsuit. (Id.).

72.     Later that same day, Plaintiff filed a sworn affidavit attesting, "**I am no longer pursuing the lawsuit listed in my bankruptcy schedules** against Sheffield and Muscle Shoals Police Departments. I have received no funds from said lawsuit of any kind." (Affidavit in Response to Status Conference) (emphasis supplied).

73.     The bankruptcy court filed an order acknowledging Plaintiff's assertion that she was no longer pursuing this lawsuit. (Order Vacating Status Conference).

74.     Plaintiff has not filed any subsequent documents correcting the bankruptcy court's understanding on that point. (See 2017 Bankruptcy Docket).

## II.     Legal Standard

"Summary judgment is appropriately granted if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fennell v.

Gilstrap, 559 F.3d 1212, 1216 (11th Cir. 2009). This standard generally requires the Court to "view the evidence in the light most favorable to the non-moving party and adopt the non-movant's version of the facts," but "only if there is a 'genuine' dispute as to those facts." Johnson v. Niehus, 491 F. App'x 945, 949 (11th Cir. 2012) (quoting, e.g., Scott v. Harris, 550 U.S. 372, 380 (2007)).

"The fact that the record contains anything at all in support of the nonmovant's position is not dispositive; *a 'genuine' dispute requires that the evidence is such that a reasonable jury could find for the nonmovant*." Hammett v. Paulding County, 875 F.3d 1036, 1049 (11th Cir. 2017) (emphasis supplied). Therefore, "[w]hen opposing parties tell two different stories, one of which is *blatantly contradicted by the record*, so that no reasonable jury could believe it, a court should not adopt that version of the facts for ruling on a motion for summary judgment." Scott, 550 U.S. at 380 (emphasis supplied). Instead, **where a plaintiff's version of events "is so utterly discredited by the record that no reasonable jury could have believed [her],"** the court must disregard that "discredited" version of events and rely instead on what is plainly depicted by the record. See id. at 380-81 (emphasis supplied).

Although Scott itself involved *video* evidence contradicting the plaintiff's version of events, see id., the same rule applies to *audio* evidence. See, e.g., Taylor v. Taylor, 649 F. App'x 737, 740 n.4 (11th Cir. 2016); Maughon v. City of Covington, 505 F. App'x 818, 819 (11th Cir. 2013) (applying Scott to "video *or*

*audio recording[s]*") (emphasis supplied); <u>James v. City of Huntsville, Ala.</u>, No. 5:14-cv-2267-AKK, 2016 WL 7972060, at \*1 n.3 (N.D. Ala. Dec. 30, 2016) (relying on audio track from video instead of contradictory evidence), *R&R adopted*, 2017 WL 346008 (N.D. Ala. Jan. 23, 2017); <u>Walke v. Malone</u>, 2018 WL 4568639, at \*1-2 (S.D. Ga. Sept. 24, 2018) (same); see also, e.g., <u>Scheffler v. Lee</u>, 752 F. App'x 239, 243 (6th Cir. 2018) (applying <u>Scott</u> to "video *or audio* evidence") (emphasis supplied).

The <u>Scott</u> rule also applies where a plaintiff's unsupported testimony is utterly discredited by overwhelming *documentary* evidence. See, e.g., <u>White v. Georgia</u>, 380 F. App'x 796, 798 (11th Cir. 2010) (disregarding plaintiff's testimony that she was shot where medical records established that injuries were not caused by a gunshot); <u>Bennett v. Parker</u>, 898 F.2d 1530, 1534 (11th Cir. 1990) (rejecting plaintiff's statements where completely unsupported by documentary evidence or corroborating testimony); <u>Davis v. Madison County, Ala.</u>, No. 5:16-cv-1166-AKK, 2018 WL 3631707, at \*2 n.2, 7 (N.D. Ala. July 31, 2018) (rejecting plaintiff's testimony concerning his medical treatment where contradicted by records); <u>Wilson v. Dawson</u>, 2015 WL 1509358, at \*7 (N.D. Fla. Mar. 31, 2015) (same).

Under this standard, "**discredited testimony is not [normally] considered a sufficient basis**" for opposing a summary judgment motion. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256-57 (1986) (bracketed alterations in original) (emphasis supplied); see also <u>Davis</u>, 2018 WL 3631707, at \*2 (citing <u>Anderson</u>, 477

U.S. at 256-57). Rather, the plaintiff "must offer some **hard evidence** showing that [her] version of the events is not wholly fanciful." Johnson, 491 F. App'x at 950 (quoting Jeffreys v. City of N.Y., 426 F.3d 549, 554 (2d Cir. 2005)); see also Anderson, 477 U.S. at 257 (requiring "affirmative evidence," rather than "discredited testimony," to defeat summary judgment).

Recognition that a plaintiff's testimony is discredited by the evidentiary record does not violate the rule barring credibility determinations at summary judgment:

> Where the "**Plaintiff relies almost exclusively on his own testimony,** much of which is **contradictory and incomplete**, it will be impossible for a district court to determine whether the jury could reasonably find for the plaintiff, and thus whether there are any genuine issues of material fact, without making *some* assessment of the Plaintiff's account."

Wilson, 2015 WL 1509358, at *7 (quoting Jeffreys, 426 F.3d at 554) (emphasis supplied). Such an assessment is made not for the purpose of determining the parties' credibility, but to ascertain "*whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.*" Johnson, 491 F. App'x at 950 (quoting Anderson, 477 U.S. at 252) (emphasis supplied); see also Scott, 550 U.S. at 380 (holding that where a summary judgment motion is well supported, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts"). Where contradictions between a Plaintiff's version of events and the rest of the record become "inescapable and unequivocal," see Bentley v. AutoZoners,

20

LLC, 935 F.3d 76, 86 (2d Cir. 2019), such that "**the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party**, [then] there is no 'genuine issue for trial.'" See Scott, 550 U.S. at 380 (emphasis supplied).

### III.   Argument

#### A.   Because No Rational Trier of Fact Could Find for Plaintiff, Sergeant Garrison is Entitled to Judgment as a Matter of Law

There is no genuine dispute of fact: Sgt. Garrison was not involved in Plaintiff's arrest in any way, and he cannot be held liable for any use of force in the scope of that arrest. Plaintiff has submitted no "hard evidence" to the contrary, see Johnson, 491 F. App'x at 950, but instead relies *solely* on her own contradictory testimony, which is discredited by the evidentiary record—*and by her own admission* that she "lie[d] under oath" as to the identities of the "police officers" involved in her arrest. (Doc. 71 at 2). Because Plaintiff's "contradictory and incomplete" testimony is "so utterly discredited by the record that no reasonable jury" could believe her, Sgt. Garrison is entitled to summary judgment and must be dismissed. See Scott, 550 U.S. at 380; Wilson, 2015 WL 1509358, at *7 (quoting Jeffreys, 426 F.3d at 554).

> i.   *Plaintiff's Recantation of Earlier Testimony Leaves Nothing in the Record Affirmatively Showing That Officer Garrison Was Involved in Her Arrest*

As an initial matter, the Court must fully disregard Plaintiff's testimony concerning her identification of Sgt. Garrison as an officer involved in her arrest, as

Plaintiff has now recanted that testimony. In her recent sworn filing, Plaintiff admitted that she "lie[d] under oath" about the identities of the officers involved in her arrest because she thought she could not add the correct officers and she wanted to keep the lawsuit alive. (See Doc. 71 at 2). Plaintiff's recantation leaves no affirmative evidence in the record purporting to overcome the otherwise undisputed proof that Sgt. Garrison had no involvement whatsoever in her arrest.

This situation is analogous to McMillian v. Johnson, 88 F.3d 1573 (11th Cir. 1996), *aff'd sub nom.* McMillian v. Monroe County, 520 U.S. 781 (1997), in which two witnesses alleged certain facts, but then submitted sworn affidavits recanting those allegations. See McMillian, 88 F.3d at 1583. The Eleventh Circuit concluded that the witnesses' subsequent sworn affidavits were indicative of what they would testify to at trial, and that their earlier (now-recanted) allegations could at best amount to impeachment evidence. See id. at 1584. Because impeachment evidence does not amount to *affirmative* evidence sufficient to defeat summary judgment, the court entirely disregarded the witnesses' earlier allegations. See id. at 1584; see also, e.g., Santos v. Murdock, 243 F.3d 681, 682-84 (2d Cir. 2001) (citing McMillian, 88 F.3d at 1584) (reaching similar conclusion where witness recanted prior testimony).

McMillian controls the outcome here. As discussed above, the evidentiary record overwhelmingly shows that Sgt. Garrison could not have used force against Plaintiff at the time of her arrest because he was not present for or otherwise involved

in that arrest. Plaintiff's testimony to the contrary has now been recanted, leaving absolutely no affirmative evidence in the record to support her earlier allegations. In the absence of such evidence, Plaintiff cannot overcome summary judgment, and all claims against Sgt. Garrison must be dismissed.

> ii.   *No Reasonable Jury, Taking the Record as a Whole, Could Find for Plaintiff*

Even assuming that Plaintiff's recantation of her deposition testimony is not itself dispositive of her claims against Sgt. Garrison, no rational factfinder could credit her deposition testimony in light of the full evidentiary record. Plaintiff's identification of Sgt. Garrison as someone involved in her arrest is premised *entirely* on her testimony that (1) she knew Sgt. Garrison from two previous encounters, and (2) she saw an officer wearing his nametag that night. Because these assertions are insufficient at best (and unquestionably false at worst), Plaintiff cannot show that Sgt. Garrison had any involvement in her arrest and cannot overcome his entitlement to summary judgment.

Plaintiff claims that she learned of Sgt. Garrison's identity, and therefore recognized him at the time of her arrest, through an introduction by her uncle in *2011* (Plaintiff Depo. 333:11-334:11, 336:1-2) and through her observation of a police officer at a family gathering in *July 2014* (id. 329:1-332:8, 334:19-25). But because Sgt. Garrison was not employed as an SPD police officer until *August 2014* (see, e.g.,

23

Garrison Depo. 4:14-16), those encounters could not possibly have occurred. Moreover, the uncle who allegedly introduced Sgt. Garrison to Plaintiff in 2011 *died 10 years prior to that supposed introduction*. (See, e.g., Ingram Death Certificate). Even without further examination of the record, a reasonable jury could not possibly credit Plaintiff's testimony as to these impossible events.

That only leaves Plaintiff's testimony that she observed an officer wearing Sgt. Garrison's nametag at the time of her arrest. (See Plaintiff Depo. 97:1-14, 99:15-21). But no rational factfinder would credit this testimony, given that Plaintiff first alleged that she could see Sgt. Garrison's nametag from over ten feet away (see id. 97:3-24, 185:25-186:24, 194:6-12), only to change this testimony after admitting that she was not wearing her reading glasses at the time (id. 394:22-395:21).[9] In any event, *the entire record of affirmative evidence* wholly discredits Plaintiff's testimony on this point, and unambiguously establishes that Sgt. Garrison was not present for her arrest.

The radio dispatch audio from the time of Plaintiff's arrest, standing alone, is enough to fully discredit Plaintiff's testimony on these points. See, e.g., Taylor, 649

---

[9]Moreover, Plaintiff effectively conceded that she could not definitively say that Sgt. Garrison was involved in her arrest when she acknowledged that it could have been *another officer* who was purportedly wearing Sgt. Garrison's nametag:

> Q:    And I think I understand – and this is a yes-or-no question. **You just said that another officer could have been wearing Officer Garrison's name tag**, did you not?
>
> A:    **That's what I said, yeah.**

(See Plaintiff Depo. 110:17-21) (emphasis supplied); see also id. 110:2-3) ("The officers could have swapped name tags. **I don't know.**") (emphasis supplied).

24

F. App'x at 740 n.4 (citing <u>Scott</u>, 550 U.S. at 380) (rejecting Plaintiff's testimony where contradicted by audio evidence). Although Sgt. Garrison is heard responding to the initial visit to Evans's house prior to the end of the day shift (see Call 2 Radio Traffic pts. 2-8), *he is never heard again in subsequent radio traffic*. (See Call 3 Radio Traffic pts. 1-4); (Call 4 Radio Traffic pts. 1-9); (Call 5 Radio Traffic pts. 1-10). Four hours later, just prior to Plaintiff's arrest, Lt. Ivy reports *only* that he, Officer Bissonnette, and Officer Bishop would be visiting her home to execute the arrest warrants. (Call 5 Radio Traffic pt. 1). *All* subsequent radio traffic features *only those three SPD officers*. (See Call 5 Radio Traffic pts. 2-10). And at no point does any officer mention Sgt. Garrison, either by name or by call sign, during that time. (See Call 5 Radio Traffic pts. 1-10). This evidence alone "utterly discredit[s]" Plaintiff's testimony. See <u>Scott</u>, 550 U.S. at 381.

This audio evidence is fully reinforced by the remaining evidentiary record. Sgt. Garrison has testified that he was not present for Plaintiff's arrest and that, to his knowledge, he has never even met her. (Garrison Aff. ¶¶ 19-20, 40); (Garrison Depo. 15:4-19). The incident report entered by Officer Bissonnette specifies that only he, Officer Bishop, and Officer Benson took part in Plaintiff's arrest. (See Incident Report #211 at 3). The shift report for that evening shows that Sgt. Garrison was not on duty. (4/18/2016 Shift C Report). Every officer present for Plaintiff's arrest asserted that Sgt. Garrison was not there. (See, e.g., Benson Depo. 30:21-32:4);

(Bissonnette Depo. 56:15-57:5, 93:1-94:4); (Bishop Aff. ¶¶ 3, 14-17). The Colbert County 911 logs, which correspond to the radio traffic audio, show that no SPD officers were on the scene other than Lt. Ivy, Officer Bissonnette, and Officer Bishop. (Call Logs at 12-14). And finally, even if Plaintiff's affidavit recanting her testimony is not dispositive to the issue of officer identification, that affidavit (Doc. 71) at least confirms the other evidence showing that Sgt. Garrison was involved in her arrest. *Every piece of "hard evidence" in the record* conclusively shows that Sgt. Garrison was not present for Plaintiff's arrest and did not use any force against her.

"Plaintiff relies almost exclusively on [her] own testimony, much of which is contradictory and incomplete." Wilson, 2015 WL 1509358, at *7 (quoting Jeffreys, 426 F.3d at 554). Because this "discredited testimony" is insufficient to oppose summary judgment, see Anderson, 477 U.S. at 256-57, Plaintiff must submit "hard evidence showing that [her] version of the events is not wholly fanciful." See Johnson, 491 F. App'x at 950 (quoting Jeffreys, 426 F.3d at 554). This she cannot do. Far from supporting "[her] version of events," the full library of affirmative evidence in this case irrefutably shows that Sgt. Garrison had nothing to do with her arrest.

Consequently, there is no genuine dispute: Sgt. Garrison could not possibly have used *any* force against Plaintiff at the time of her arrest, much less the force she alleges in this case. As a result, Sgt. Garrison is entitled to judgment in his favor as a matter of law, and Plaintiff's claims against him are due to be dismissed.

26

**B.** **Plaintiff's Misrepresentations to the Bankruptcy Court Require That Her Claims Be Dismissed**

Separate and apart from the merits of this case, the Court should dismiss Plaintiff's claims against Sgt. Garrison due to her affirmative misrepresentations to the bankruptcy court in her Chapter 13 proceeding. Even though the instant lawsuit remains pending, Plaintiff has recently represented to the bankruptcy court—in a sworn affidavit—that she is no longer pursuing this lawsuit. (See Affidavit in Response to Status Conference). Because of these deliberate misrepresentations, Plaintiff must be judicially estopped from pursuing the present lawsuit, and all claims against Sgt. Garrison must be dismissed.

The doctrine of judicial estoppel:

> is intended to "prevent the perversion of the judicial process" and "protect [its] integrity . . . by prohibiting parties from deliberately changing positions according to the exigencies of the moment." When a party does so, the doctrine of judicial estoppel allows a court to exercise its discretion to dismiss the party's claims. Stated simply, the doctrine of judicial estoppel rests on the principle that "absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory."

Slater v. U.S. Steel Corp., 871 F.3d 1174, 1180-81 (11th Cir. 2017).

In Chapter 13 bankruptcy proceedings "[a] debtor who has filed for bankruptcy 'must file sworn disclosures listing his debts and his assets, including any pending civil claims, and identifying any lawsuits he has filed against others." Weakley v.

Eagle Logistics, 894 F.3d 1244, 1245 (11th Cir. 2018) (per curiam) (quoting Slater, 871 F.3d at 1180 n.4. The disclosure of pending lawsuits is critical because the existence or nonexistence of such lawsuits will impact the debtor's repayment obligations to her creditors. See Slater, 871 F.3d at 1179. Therefore, "[w]hen a debtor fails to list a pending civil claim as an asset in a bankruptcy proceeding, the equitable doctrine of judicial estoppel allows a court to exercise its discretion to dismiss the debtor's civil claim." Weakley, 894 F.3d at 1245-46 (citing Slater, 871 F.3d at 1180).

The Eleventh Circuit considers two questions when applying judicial estoppel: "(1) Whether the plaintiff 'took a position under oath in the bankruptcy proceeding that was inconsistent with the plaintiff's pursuit of the civil lawsuit[s],' and (2) whether the inconsistent positions 'were calculated to make a mockery of the judicial system.'" See id. at 1246 (quoting Slater, 871 F.3d at 1180-81). The first prong is satisfied simply by the omission of a pending lawsuit from sworn filings in the bankruptcy proceeding. See id. (citing Robinson v. Tyson Foods, Inc., 595 F.3d 1269, 1275 (11th Cir. 2010)). In assessing the second prong, courts may consider:

> [1] the plaintiff's level of sophistication, [2] whether and under what circumstances the plaintiff corrected the disclosures, [3] whether the plaintiff told his bankruptcy attorney about the civil claims before filing the bankruptcy disclosures, [4] whether the trustee or creditors were aware of the civil lawsuit or claims before the plaintiff amended the disclosures, [5] whether the plaintiff identified other lawsuits to which he was [a] party, and [6] any findings or actions by the bankruptcy court after the omission was discovered.

Id. (quoting Slater, 871 F.3d at 1185).

The facts in this case easily establish both prongs of the Eleventh Circuit's test for applying judicial estoppel. The first factor is indisputable: in response to the Trustee's recent inquiry concerning the status and potential settlement value of her ongoing lawsuit (see Tr.'s Motion for Status Conference), Plaintiff represented "that [she] **no longer seeks to pursue the civil litigation**," *i.e.*, the "lawsuit listed in the [Plaintiff's] Schedules." (Order Vacating Status Conference). She then filed an affidavit expressly stating that she was no longer pursuing this lawsuit. (Affidavit in Response to Status Conference). "There is no question" that by making sworn representations to the bankruptcy court that she had abandoned this lawsuit, while simultaneously continuing to pursue it, Plaintiff has taken "inconsistent position[s]" under oath in the two proceedings. See Weakley, 894 F.3d at 1246.

The record is also clear that Plaintiff "intended to mislead the [bankruptcy] court" and "make a mockery of the judicial system." See id. Having now filed three bankruptcy petitions, including at least two petitions in which pending lawsuits were listed as assets, Plaintiff is sophisticated enough to understand her obligations in Chapter 13 proceedings. See, e.g., Weakley, 894 F.3d at 1246 (taking plaintiff's prior bankruptcy petitions into account when determining sophistication). Plaintiff has done nothing to correct her recent misrepresentations to the bankruptcy court. (See 2017 Bankruptcy Docket). The fact that this lawsuit was listed in her initial petition

(2017 Bankruptcy Plan at 14) demonstrates that Plaintiff did not hide her civil claims from her bankruptcy attorney. And while the Trustee was aware of this lawsuit as a result of Plaintiff's original disclosures, both the Trustee and the bankruptcy court are now apparently operating on the understanding that Plaintiff has abandoned this lawsuit—an understanding that has clear implications for the valuation and administration of Plaintiff's bankruptcy estate in the course of her Chapter 13 proceeding. See, e.g., Slater, 871 F.3d at 1179. In short, Plaintiff's *affirmative* misrepresentations in response to the Trustee's inquiry were plainly calculated to exclude a potentially lucrative asset from her bankruptcy estate. See Weakley, 894 F.3d at 1246 (noting circumstances suggesting that plaintiff "intentionally misled the bankruptcy court" concerning "lucrative, non-exempt [lawsuit assets]").

Plaintiff "took a position under oath in the bankruptcy proceeding that was inconsistent with [her] pursuit of [this] lawsuit," and these inconsistent positions "were calculated to make a mockery of the judicial system." See Slater, 871 F.3d at 1180. Accordingly, under the doctrine of judicial estoppel, the Court should dismiss Plaintiff's claims against Sgt. Garrison. See id.

## IV.   **Conclusion**

For the reasons set forth above, Sergeant Sam Garrison's motion for summary judgment is due to be granted.

s/ David J. Canupp
David J. Canupp

s/ J. Bradley Emmons
J. Bradley Emmons

LANIER FORD SHAVER & PAYNE, P.C.
P. O. Box 2087
2101 West Clinton Avenue,  Suite 102 (35805)
Huntsville, AL 35804
Phone: 256-535-1100 / Fax: 256-533-9322
E-mail:  djc@LanierFord.com & jbe@LanierFord.com

Attorneys for Defendant Sam Garrison

## CERTIFICATE OF SERVICE

I certify that I have filed the foregoing with the Clerk of the Court using the ECF System, which will send notification of such filing to those parties of record who are registered for electronic filing, and further certify that those parties of record who are not registered for electronic filing have been served by mail by depositing a copy of the same in the United States mail, first class postage prepaid and properly addressed to them as follows:

Terrell E. McCants
Christopher L. Burrell
Burrell & McCants, LLC
712 32nd Street South
Birmingham, AL 35233
Phone: 205-202-5599
Email:  terrell@burrellmccants.com
Email: chris@burrellmccants.com


Allen L Anderson
Allison B Chandler
F & B LAW FIRM PC
213 Greene Street
Huntsville, AL 35801
256-536-0095
Fax: 256-536-4440
Email: anderson@fb-pc.com
Email: court@fb-pc.com

Cheryl Jarmon-Goodman
501 ½ West Eason Avenue
Muscle Shoals, AL 35661


on this the 4th day of October, 2019.

s/ David J. Canupp
David J. Canupp

32